Dissent by Judge WATFORD
OPINION
IKUTA, Circuit Judge:
This case requires us to determine whether the names of foreign students and instructors at the Western Hemisphere Institute for Security Cooperation (WHIN-SEC) are exempt from disclosure under Exemption 6 of the Freedom of Information Act (FOIA). 5 U.S.C. § 552(b)(6). Because we conclude that the disclosure of these names “would constitute a clearly unwarranted invasion of personal privacy,” id., we reverse the district court’s grant of summary judgment to the plaintiffs.
I
We begin with the factual background regarding the development of WHINSEC, the Department of Defense’s adjustments to its disclosure policy in light of the terrorist attacks of. 2001, and the plaintiffs’ lawsuit.
A
The United States Army School of the Americas (SOA) opened in 1946 “for the purpose of providing military education and training to military personnel of Central and South American countries and Caribbean countries.” 10 U.S.C. § 4415(b) (1987). In 1989, during the Salvadoran Civil War, Salvadoran soldiers gunned down six Jesuit priests as well as their housekeeper and her 16-year-old daughter. It was. later reported that 19 of the 26 soldiers implicated in these deaths had attended SOA. These murders sparked protests against SOA and prompted the formation of School of the Americas Watch (SOAW), a human rights and advocacy group dedicated to monitoring SOA graduates and lobbying for closure of the school.[1]
As part of these monitoring efforts, SOAW submitted a FOIA request to the *756 Department of Defense (DOD) seeking the names of all former and current SOA students and instructors. The DOD granted the request in 1994, and disclosed the names of all SOA students and instructors dating back to the school’s formation in 1946. SOAW used the names to create a database containing the names, countries, and courses taken or taught by each attendee.
In 1997, Congress sought to improve the human rights record of SOA by adopting the Leahy Amendments to the Foreign Operations Appropriations Act. See Foreign Operations, Export Financing, and Related Programs Appropriation Act, 1998, Pub. L. No. 105-118, § 570, 111 Stat. 2386, 2429 (1997).[2] The Leahy Amendments precluded the DOD from providing congressionally appropriated funds to any unit of a foreign country’s security forces if there was credible evidence that the unit “has committed gross violations of human rights,” unless the Secretary of State reported to Congress that the foreign government was “taking effective measures to bring the responsible members of the security forces unit to justice.” Id.
Congress reenacted the Leahy Amendments in subsequent appropriations bills[3] until 2008, when the amendments were codified as part of the DOD appropriations rules, 10 U.S.C. § 2249e, and the Foreign Assistance Act, 22 U.S.C. § 2151 et seq. The provisions pertaining to the DOD, 10 U.S.C. § 2249e, state that no funds “made available to the Department of Defense ... may be used for any training, equipment, or other assistance for a unit of a foreign security force if the Secretary of Defense has credible information that the unit has committed a gross violation of human rights.” Id. § 2249e(a)(l). The law further requires the Secretary of Defense to consult with the Secretary of State to “ensure that prior to a decision to provide any training, equipment, or other assistance to a unit of a foreign security force full consideration is given to any credible information available to the Department of State relating to human rights violations by such unit.” Id. § 2249e(a)(2). The statute does not require the DOD to continue to monitor the performance of such units or the careers of individual members of those units after they leave WHINSEC. *757 The provisions pertaining to the Secretary of State impose a similar ban on providing assistance to a unit believed to have committed human rights violations. 22 U.S.C. § 2378d.[4] As later amended in 2011, the statute also directs the Secretary of State to “establish, and periodically update, procedures to ... ensure that when an individual is designated to receive United States training, equipment, or other types of assistance the individual’s unit is vetted as well- as the individual.” • Id. § 2378d(d)(5).[5] If the Secretary determines that a particular unit is ineligible for assistance, the Secretary is required to “make publicly available, to the maximum extent practicable, the identity of those units for which no assistance shall be furnished.” Id. § 2378d(d)(7). As with the statute regulating the- DOD, there is no requirement for the Secretary of State to continue monitoring students for human rights abuses after they graduate from WHINSEC. In short, the statutes require the Secretary of State to take the lead in vetting foreign units receiving United States assistance, and the Secretary of Defense to consider information from the State Department before providing training or assistance to foreign military units, but not to continue such vetting after the .assistance has concluded.
B
In conjunction with implementing these laws, Congress replaced SOA with a new training facility called the Western Hemisphere Institute for Security Cooperation (WHINSEC). See Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, Pub. L. No. 106-398, § 911,114 Stat. 1654A-226 (2000) (codified at 10 U.S.C. § 2166). WHINSEC, which opened its doors on January 17, 2001, provides “professional education and training to eligible personnel of nations of the Western Hemisphere.” 10 U.S.C. § 2166(b). Section 2166 states that one of the purposes of WHINSEC is “promoting ... respect for human rights.” Id. To accomplish this goal, Congress required that the WHINSEC curriculum “include mandatory instruction for each student, for at least 8 hours, on human rights, the rule of law, due process, civilian control of the military, and the role of the military in a democratic society.” Id. § 2166(d)(1).
To ensure that WHINSEC complies with its statutory obligations, Congress established an independent WHINSEC Board of Visitors charged with “inquiring] into the curriculum, instruction, physical equipment, fiscal affairs, and academic methods of [WHINSEC].” Id. § 2166(e)(4)(A). Under this statute, the Board of Visitors must hold an annual public meeting and “submit to the Secretary of Defense a written report of its activities and of its views and recommendations pertaining to the Institute.” Id. §§ 2166(e)(3), (6). Pursuant to these obligations, the Board of Visitors maintains an updated database containing details on its *758 annual meetings from 2002 to the present.[6] The minutes reflect that the Board closely oversaw the development of WHINSEC’s human rights curriculum, see Board of Visitors WHINSEC, Minutes of Annual Meeting (Jun. 3-4, 2002),[7] and ultimately concluded that WHINSEC “is a success story, in terms of its diligent pursuit of its mission of teaching professional military values, including human rights and democracy,” Board of Visitors WHINSEC, Minutes of Annual Meeting (Dec. 1-2, 2004).[8] In executing its ongoing duty to monitor WHINSEC’s fulfillment of its human rights mission,[9] the Board has formed a curriculum subcommittee which has “observed classes, reviewed selected lesson plans and reference material, and visited training facilities,” as well as interviewed students and faculty. Memorandum from Matthew D. Anderson & Robert C. Morli-no, WHINSEC BoV, on Curriculum Review of WHINSEC (July 13, 2007) (Annex 3 in Sec’y of Def.,,Annual Report to Cong, on the Activities of the Western Hemisphere Institute for Security Cooperation 19 (2007)). In 2007, the Board’s curriculum subcommittee concluded that WHINSEC had made “enormous strides in inserting human rights and democracy education into the curriculum, and is reported to have exceeded minimum required hours of instruction.” Memorandum from the Curriculum Review Sub-Committee, WHIN-SEC BoV, on Review of WHINSEC Curriculum (May 30, 2007) (Annex 3 in Sec’y of Def., Annual Report to Cong, on the Activities of the Western Hemisphere Institute for Security Cooperation 25 (2007)).[10] Based on this report, the Board of Visitors concluded that WHINSEC “was meeting and in some cases exceeding its congressional mandate in the area of promoting human rights and democratic values.” Memorandum from Matthew D. Anderson & Robert C. Morlino, WHIN-SEC BoV, on Curriculum . Review of WHINSEC (July 13, 2007) (Annex 3 in Sec’y of Def., Annual Report to Cong, on the Activities of the Western Hemisphere Institute for Security Cooperation 19 (2007)).
While the State Department, rather than WHINSEC, is responsible for vetting the individuals designated to attend the school, the Board has reviewed the vetting process in response to public comments. - Letter from Ambassador Jose S. Sorzano, Immediate Past Board Chairman, WHINSEC BoV & Bishop Robert C. Morlino, Board Chairman, WHINSEC BoV, to School of Americas Watch 1-2 *759 (Feb. 15, 2007) (Annex F in Sec’y of Def., Annual Report to Cong, on the- Activities of the Western Hemisphere Institute for Security Cooperation (2006)). On one occasion, in response to charges by SOAW that “several alleged human rights violators had participated in WHINSEC programs,” the Board requested an investigation into the vetting process and reported' that “effort and care” went into making the vetting process “rigorous, labor intensive, layered, and multi-agency.” Id. at 1-2.[11] As part of its oversight effort, despite having neither funds nor legal authority “to follow the subsequent military careers of former [WHINSEC] students on an organized basis,” the Board of Visitors nevertheless employed analysts to conduct external evaluations, used a survey tool developed by the United States Southern Command, and made efforts through contacts in foreign countries to obtain ongoing information regarding former WHINSEC students. Board of Visitors WHINSEC, Minutes of Annual Meeting 4 (Dec. 1-2, 2004).
Each report by the Board of Visitors is ultimately sent to the Secretary of Defense, who is then required to submit a detailed annual report to Congress. 10 U.S.C. § 2166(i). In its 2007 report, the Secretary noted that the ‘WHINSEC Democracy and Human Rights Program is a very successful and innovative program” that “is woven into every aspect of the curriculum.” Sec’y of Def., Annual Report to Cong, on the Activities of the Western Hemisphere Institute for Security Cooperation 3 (2007). With respect to the student selection process, the Secretary stated that after the participating foreign countries nominate individuals to attend WHINSEC, the American Embassy in each country conducts a background check, which is “followed up by thorough vetting at the Department of State, in accordance with the Leahy Amendment.” Id. at 7. The nominees “are scrutinized for records of human rights abuses, corruption, or criminal activities that would render them ineligible or inappropriate for U.S. training programs.” Id.
C
The terrorist attacks of September 11, 2001, which occurred just nine months after WHINSEC began operations, heightened the DOD’s concerns regarding protecting its personnel. On November 9, 2001, the DOD issued a memorandum instructing all DOD components to “ordinarily withhold lists of names and other personally identifying information of personnel ... in response to requests under the FOIA.” The memorandum also reemphasized the DOD’s longstanding policy of refusing to disclose identifying information of American service members. 5 U.S.C. § 552(b)(3). In 2006, the DOD promulgated regulations to formalize this policy, mandating that “Army components shall ordinarily withhold lists of names (including active duty military, civilian employees, contractors, members of the National Guard and Reserves, and military dependents) and other personally identifying information” in response to FOIA requests. 32 C.F.R. § 518.13(f)(2).
The DOD’s November 9, 2001 memorandum regarding American military personnel did not immediately impact WHINSEC’s privacy policies. The DOD continued disclosing the names of WHIN-SEC students and instructors through 2004, and SOAW incorporated each new set of names into its database. SOAW’s *760 database included some 60,000 names, which it used to identify individuals who have allegedly engaged in human rights abuses,
In 2005, however, the Army’s General Counsel determined that international personnel should be accorded the same right to privacy as U.S. personnel. Following this decision, the DOD ceased its annual public disclosure of WHINSEC students and instructors and began to redact the names of WHINSEC students from all publicly released documents. The DOD continued to comply with the Leahy Amendment requirements to disclose the names of WHINSEC students and instructors to Congress in a classified format. In 2010, Congress amended the National Defense Authorization Act to require the Secretary of Defense to “release to the public, upon request ... the entire name ... [of] each student and instructor at the Western Hemisphere Institute for Security Cooperation,” but the statute allowed the Secretary to “waive the [disclosure] requirement ... if the Secretary determines it to be in the national interest.” National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 1083,123 Stat. 2190, 2482 (2009). The Secretary exercised his authority to waive disclosure in both 2009 and 20Í0. This disclosure requirement was not included in subsequent appropriations bills.[12]
In March 2010, the House of Representatives Committee on Armed Services convened a hearing to receive testimony from U.S. Air Force General Douglas Fraser, Commander of the United States Southern Command, and U.S. Air Force General Victor Renuart, Jr., Commander of the North American Aerospace Defense Command. See Hearing on National Defense Authorization Act for Fiscal ■ Year 2011 and Oversight of Previously Authorized Programs Before the H. Comm, on Armed Services, 111th Cong. 1 (2010). Among other issues, the generals addressed questions regarding a proposed amendment to the appropriations act that would authorize publication of personal information of WHINSEC students. General Fraser spoke against public disclosure of the names of WHINSEC students and urged Congress to respect the “rights and desires of the nations who provide [WHINSEC students]” by protecting their privacy. Id. at 16. He further stated that disclosure would threaten the privacy of the United States citizen instructors and staff. Id. General Renuart agreed with General Fraser regarding “the importance of maintaining the security of the individuals attending [WHINSEC], as well as the faculty.” Id. In explaining the risks of disclosure, General Renuart described an event that, while not involving a WHINSEC attendee, was “an example of what can happen when information is in fact released.” Id. The event involved the Mexican navy’s successful raid on Arturo Beltran Leyva, the alleged leader of a Mexican drug cartel. One of the naval officers involved in the raid was killed, and his name was subsequently released to the public. As a result, his mother, wife and children were killed. According to General Renuart, the DOD could not “afford to have the information that is held in WHINSEC released because it will have that kind of effect potentially for the individuals who are extremely valuable to us.” Id. at 19. Accordingly, General Ren- *761 uart advised the representatives that “we need to be very careful about the release of that information, and we would oppose that.” Id. Congress ultimately decided not to include the disclosure requirement in the appropriations act.
D
On March 1, 2011, two members of SOAW, Theresa Cameranesi and Judith Liteky, sent a FOIA request to the DOD (specifically, the U,S. Army Training and Doctrine Command) for “the names, ranks, branches, countries of origin, lists of courses taken or taught, and/or dates and years of attendance of students, instructors, and guest instructors at [WHIN-SEC]” in fiscal years 2005 to 2010. A few weeks later, the plaintiffs amended their FOIA request to request information on the units of WHINSEC students and instructors. The DOD partially denied the request on April 5, 2011. It disclosed some responsive records but withheld the names or units of WHINSEC attendees under FOIA Exemption 6. See 5 U.S.C. § 552(b)(6). The plaintiffs filed an administrative appeal, which the DOD denied on June 8, 2011.
Following the denial of their administrative appeal, the plaintiffs filed suit in district court, claiming that DOD violated FOIA by failing to disclose the requested records. The parties filed cross-motions for summary judgment. In its motion, the DOD argued that it was entitled to withhold the identifying information regarding students and instructors under Exemption 6 to FOIA, 5 U.S.C. § 552(b)(6), and submitted two affidavits from Lee A. Rials, the Public Affairs Specialist for WHIN-SEC, in support. Rials’s affidavits stated that “[t]here are a number of risks associated with releasing the names of WHINSEC students, instructors, and guest instructors,” because these students “are . directly involved in conflicts with criminal gangs, drug cartels, and other violent individuals.” Rials then stated that assessments prepared by the Defense Intelligence Agency (which had not been approved for public release) “indicate that the public disclosure of WHINSEC’s records may increase the threat to Latin American students from: (1) the intelligence and security apparatuses of countries hostile to U.S. interests and to U.S. partner nations in the Western Hemisphere; (2) terrorist organizations operating in the Western Hemisphere; and (3) drug trafficking organizations operating in the Western Hemisphere.” As an example, Rials stated that in some countries “security personnel and their families have been attacked after being identified in the media,” and referenced the 2010 testimony of General Renuart before the House Armed Services Committee; Finally, Rials stated that foreign nations participating in the WHINSEC program opposed “public disclosure of personally identifying information of students and instructors” and that such disclosure “may have adverse effects on future participation in training programs at WHIN-SEC.”
The district court granted summary judgment in favor of the plaintiffs. It held that DOD had not established that WHIN-SEC students and instructors had “a substantial privacy interest in their names” because they had not been promised confidentiality and their names had been routinely provided to the public before 2004.[13] The DOD timely appealed.
II
In the past, we employed a standard unique to FOIA cases for reviewing a *762 district court’s summary judgment. See Yonemoto v. Dep’t of Veterans Affairs, 686 F.3d 681, 688 (9th Cir. 2011) (holding that in reviewing a grant of summary judgment in a FOIA case, we first review de novo whether there is an adequate factual basis to support the district court’s decision, and if there is, we then review the district court’s conclusions of fact for clear error). We have now overruled this FOIA-specific summary judgment standard, and instead apply our usual summary judgment standard. See Animal Legal Def. Fund v. U.S. Food & Drug Admin., No. 18-17181, 836 F.3d 987, 989-90, 2016 WL 4678362, at *2 (9th Cir. Sept. 2, 2016) (en banc). Accordingly, we now review the district court’s grant or denial of motions for summary judgment de novo. Id. “[W]e view the evidence in the light most favorable to the nonmoving party, determine whether there are any genuine issues of material fact, and decide whether the district court correctly applied the relevant substantive law.” Id. at 989, 2016 WL 4578362 at *1. “If there are genuine issues of material fact in a FOIA case, the district court should proceed to a bench trial or adversary hearing.” Id. at 990, 2016 WL 4578362 at *2. In this case, the facts are undisputed and the decision turns on the legal issue whether disclosure of the names of foreign students and instructors at WHINSEC “would constitute a clearly unwarranted invasion of personal privacy” for purposes of Exemption 6. 5 U.S.C. § 552(b)(6). We have jurisdiction to review the district court’s grant of summary judgment under 28 U.S.C. § 1291.
Ill
FOIA requires federal agencies to disclose records that are requested by a member of the public. 5 U.S.C. § 552. The statute provides that “each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules ... and procedures to be followed, shall make the records promptly available to any person.” Id. § 552(a)(3)(A).[14] FOIA’s disclosure obligations extend to all agency records except the nine categories of records listed in § 552(b) as exempt from disclosure. “[A]s a general rule, when documents are within FOIA’s disclosure provisions, citizens should not be required to explain why they seek the information” because information about government functions “belongs to citizens to do with as they choose.” Nat’l Archives & Records Admin. v. Favish, 541 U.S. 157, 172, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004). But when disclosure affects the types of information protected by the exemptions, “the usual rule that the citizen need not offer a reason for requesting the information must be inapplicable.” Id.
At issue here is Exemption 6, which provides that FOIA “does not apply to ... personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.” Id. § 552(b)(6). In order to withhold information from disclosure under Exemption 6, the agency must specifically invoke the exemption and must carry the burden of proving that disclosure “would constitute a clearly unwarranted invasion of personal privacy.” See Yonemo-to, 686 F.3d at 693. A person requesting information protected by privacy interests “must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,” and must also *763 show that “the information is likely to advance that interest.” Favish, 541 U.S. at 172, 124 S.Ct. 1570. “Otherwise, the invasion of privacy is unwarranted.” Id.
 When evaluating an agency’s invocation of an exemption to FOIA, we “balance the public interest in disclosure against the interest Congress intended the [exemption to protect.” Dep’t of Def. v. Fed. Labor Relations Auth., 510 U.S. 487, 495, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994). Cur eases establish a two-step test for balancing individual privacy rights against the public’s right of access. First, we evaluate the personal privacy interest at stake to ensure “that disclosure implicates a personal privacy interest that is nontrivial or ... more than [ ] de minimis.” Yonemoto, 686 F.3d at 693 (internal citation and quotation marks omitted). Second, if the agency succeeds in showing that the privacy interest at stake is nontrivial, we then “employ a balancing approach: We place the privacy interests identified at the first step on one end of the balance, and the public interest favoring disclosure on the other.” Id. at 694.
A
We generally begin with an evaluation of the privacy interests at stake, which must be ■ “some nontrivial privacy interest in nondisclosure.” Fed. Labor Relations Auth., 510 U.S. at 501, 114 S.Ct. 1006 (emphasis omitted). A showing that the interest is more than de minimis will suffice. See Lahr v. Nat’l Transp. Safety Bd., 569 F.3d 964, 977 (9th Cir. 2009). “The personal privacy contemplated by Exemption 6, as well as its law-enforcement counterpart, Exemption 7(C), ... is not some limited or cramped notion of that idea.” Yonemoto, 686 F.3d at 693 (internal citation and quotation marks omitted).[15] Rather, a disclosure implicates personal privacy if it affects either “the individual’s control of information concerning his or her person,” Dep’t of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 763, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), or constitutes a “public intrusion[ ] long deemed impermissible under the common law and in our cultural traditions,” Favish, 541 U.S. at 167, 124 S.Ct. 1570.[16]
Disclosures that would subject individuals to possible embarrassment, harassment, or the risk of mistreatment constitute nontrivial intrusions into privacy under Exemption 6. See Dep’t of State v. Ray, 502 U.S. 164, 176-77, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991); see also Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv., 524 F.3d 1021, 1025-28 (9th Cir. 2008); Painting Indus. of Haw. Mkt. Recovery Fund v. U.S. Dep’t of Air Force, 26 F.3d 1479, 1483 (9th Cir. 1994). In Ray, for instance, immigration attorneys made a FOIA request for the names of deported Haitian nationals who ■ had been interviewed by the U.S. government to deter *764 mine whether they had been persecuted upon their return to Haiti. 502 U.S. at 168— 69, 112 S.Ct. 541. The Court rejected the plaintiffs’ argument that “any invasion of privacy from the mere act of disclosure of names and addresses would be de minimis and little more than speculation.” Id. at 170,112 S.Ct. 541 (internal quotation omitted). Rather, the Court held that disclosing the interviewees’ names was a “significant invasion of their privacy” because it “could subject them or their families to embarrassment in their social and community relationships,” expose them “to possible embarrassment and retaliatory action,” or put them at “risk of mistreatment.” Id. at 176-77 & n.12, 112 S.Ct. 541(internal quotation marks omitted).
We have similarly held that the potential for harassment from third parties gives rise to a cognizable privacy interest. In Forest Service Employees, we considered a public interest group’s FOIA request for the names of 23 firefighters who had participated in fighting a wildfire in which two firefighters died. 524 F.3d at 1023. We concluded that the employees had nontrivial privacy interests in the disclosure of them names because Exemption 6 protected' against the “potential for harassment” that “would be presented by the media, curious neighbors, and the [public interest group] itself,” which might try to make unwanted contacts with the employees. Id. at 1026. In so holding, we explained- that “[t]he avoidance of harassment is a cognizable privacy interest under Exemption 6,” even when the harassment at issue is merely “unwanted commercial solicitations.” Id. (citing Painting Indus., 26 F.3d at 1483); see also Prudential Locations LLC v. U.S. Dep’t of Housing and Urban Dev., 739 F.3d 424, 432 (9th Cir. 2013). Similarly, Lahr noted that “protection from ... unwanted contact [by third parties] facilitated by disclosure of a connection to government operations and investigations is a cognizable privacy interest” under Exemption 6. 569 F.3d at 976.
An agency may carry its burden of establishing a nontrivial privacy interest by submitting affidavits showing that the requested disclosure has “[t]he potential” to result in the sorts of harassment described in our cases. Lahr, 569 F.3d at 976. Although “a threat to privacy [that] is conceivable on some generalized conjectural level is not sufficient to justify invoking Exemption 6,” Yonemoto, 686 F.3d at 694, “the invasion of a personal privacy interest may be ‘clearly unwarranted’ even when the invasion of privacy is far from a certainty,” Prudential Locations, 739 F.3d at 432. The Supreme Court has relied on an agency’s reasonable assessment that disclosure “could subject” the affected individuals “to possible” invasion of privacy, Ray, 502 U.S. at 176 & n.12, 112 S.Ct. 541 (emphases added), and we have regularly done the same, see Prudential Locations, 739 F.3d at 432 (disclosure “would likely” result in an invasion of privacy); Lahr, ‘569 F.3d at 977 (disclosure “could” result in an invasion of privacy); Forest Serv. Emps., 524 F.3d at 1026 (disclosure “may” result in an invasion of privacy). Particularly in cases involving foreign policy and national security issues, “any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm.” ACLU v. U.S. Dep’t of Def., 628 F.3d 612, 619 (D.C. Cir. 2011) (internal quotation marks omitted). Therefore, an agency carries its burden if the affidavit provides a justification for invoking a FOIA exemption that “appears logical or plausible.” Id. (internal quotation marks omitted).
B
If the agency succeeds in showing a nontrivial privacy interest at step one, we *765 then proceed to step two. At this step, we balance the individual’s right of privacy against the public interest in disclosure.
For purposes of FOIA, the pertinent public interest is the interest in understanding “the operations or activities of the government” and in monitoring an agency’s action. Forest Serv. Emps., 524 F.3d at 1025-27. Said otherwise, “the only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would she[d] light on an agency’s performance of its statutory duties or otherwise let citizens know what their government is up to.” Yonemoto, 686 F.3d at 694 (quoting Bibles v. Or. Nat. Desert Assn., 519 U.S. 355, 355-56, 117 S.Ct. 795, 136 L.Ed.2d 825 (1997) (per curiam)). We do not give weight to the FOIA requester’s personal interest in obtaining information “fb]e-cause Congress clearly intended the- FOIA to give any member of the public as much right to disclosure as one with a special interest.” Fed. Labor Relations Auth., 510 U.S. at 496, 114 S.Ct. 1006 (internal quotation marks omitted).
In order to determine the weight of the public interest at issue, we must evaluate whether the person requesting the information has shown “sufficient rear son for the disclosure,” Favish, 541 U.S. at 172, 124 S.Ct. 1570. Favish developed a standard for determining whether a requester has shown such a reason in cases where the requester is seeking information ‘“to show that responsible - officials acted negligently or otherwise improperly in the performance of their duties.” Id. at 174, 124 S.Ct. 1570. Although noting that there is generally a “presumption of legitimacy accorded to the Government’s official conduct,” and “clear evidence is usually required to displace” that presumption, Favish adopted a less stringent standard in the FOIA context: “the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.” Id. Although it is easier for a requester to meet this “reasonable belief’ standard than a “clear evidence” standard, a court must still “insist on a meaningful ■ evidentiary showing” by the requester because “[a]llegations of government misconduct are easy to allege and hard to disprove.” Id. at 175, 124 S.Ct. 1570. “Only when the FOIA requester has produced evidence sufficient to satisfy this standard will there exist a counterweight on the FOIA scale for the court to balance against the cognizable privacy interests in the requested records.” Id. at 174-75, 124 S.Ct. 1570.[17]
*766 Even when the requester’s evidence has met the standard of showing “more than a bare suspicion” that responsible officials acted negligently, id. at 174, 124 S.Ct. 1570, the requester must still show that “the requested information is likely to advance” a significant public interest, id. at 172⅛ 124 S.Ct. 1570. Consequently, if the information sought does not “add significantly to the already available information concerning the manner in which [the agency] has performed its statutory duties,” we do not give the public interest much weight. Prudential Locations, 739 F.3d at 433. When the FOIA requester seeks information about whether an agency properly performed a statutory duty, and the government has already investigated this issue and revealed information relating to its investigation, we deem the public interest in obtaining additional information to be less weighty unless the “marginal additional usefulness of [the sought] information” is significant. See Forest Serv. Emps., 524 F.3d at 1027-28.
IV
We now apply this two-step test to determine whether disclosing the names of foreign WHINSEC students and instructors “would constitute a clearly unwarranted invasion of personal privacy” for purposes of Exemption 6. 5 U.S.C. § 552(b)(6).
A
We first consider whether disclosure of the names and units of foreign WHINSEC students and instructors implicates a nontrivial privacy interest. See Yonemoto, 686 F.3d at 693. We give little weight to the district court’s ruling that DOD failed to establish that WHINSEC students and instructors had “a substantial privacy interest in their names and military units” because the district court applied the wrong legal standard; it should have considered whether nontrivial privacy interests, rather than substantial privacy interests, were at stake.
Here, the evidence submitted by the DOD demonstrated that disclosure of the identities of foreign WHINSEC students and instructors could give rise to harassment, stigma, or violence as a result of their association with the United States—exactly the sorts of risks that courts have recognized as nontrivial in previous cases. See Ray, 502 U.S. at 176-77, 112, S.Ct. 541; Lahr, 569 F.3d at 975-76; Forest Serv. Emps., 524 F.3d at 1025-28; Painting Indus., 26 F.3d at 1483. The DOD submitted sufficient evidence to substantiate this nontrivial risk, see Lewis v. IRS, 823 F.2d 375, 378 (9th Cir. 1987), including Rials’s affidavits and the testimony of two United States generals.
The plaintiffs argue that the evidence of risks faced by the WHINSEC students and instructors should be disregarded as overly speculative. We disagree. We have never held that an agency must document that harassment or mistreatment have happened in the past or will happen in the future; rather, the agency must merely establish that disclosure would result in a “potential for harassment.” Forest Serv. Emps., 524 F.3d at 1026. Here, the government’s affidavits set forth its conclusion *767 that foreign military and law enforcement personnel who are publicly associated with the United States could be subject to mistreatment or attack. See Ray, 502 U.S. at 176, 112 S.Ct. 541. The same concerns rationally underlay the DOD’s decision to protect the identity of U.S. law enforcement-and military personnel from FOIA requests. See 32 C.F.R. § 518.13(f)(2); see also 32 C.F.R. § 286.12(f)(2) (providing that DOD will not disclose the “names and duty addresses” of United States “military and civilian personnel who are assigned to units that are sensitive, routinely deploya-ble, or stationed in foreign territories” because such disclosure “can constitute a clearly unwarranted invasion of personal privacy”). Because the government’s determination that foreign law enforcement and military personnel would face similar risks if their identities were revealed is logical and plausible, it is sufficient to establish that WHINSEC students and instructors have a nontrivial privacy interest. See ACLU v. Dep’t of Def., 628 F.3d at 619; see also Prudential Locations, 739 F.3d at 432; Lahr, 569 F.3d at 977; Forest Serv. Emps., 524 F.3d at 1026.
The district court also erred in holding that the WHINSEC students and instructors lacked a nontrivial privacy interest because the DOD had not promised confidentiality. As a legal matter, “an assurance of confidentiality from the government” is not a necessary condition “for the existence of a cognizable personal privacy interest under Exemption 6.” Prudential Locations, 739 F.3d at 431-32. Moreover, the court’s conclusion that WHINSEC students and instructors do not have a reasonable expectation of privacy is not supported by the record. The DOD has not disclosed the names of WHINSEC students since 2004 and likewise redacts the names of WHINSEC students from public documents. Any disclosures are now made only with the consent of the students or the sending nation. A majority of foreign countries that send students to WHIN-SEC rely on the DOD’s current disclosure practices and oppose public disclosure of the identities of their students and instructors. Further, the DOD exercised its discretion to ensure that no disclosures would be made in response to Congress’s requirement that the DOD disclose the names of WHINSEC students in 2009 and 2010, and Congress chose not to reenact this requirement. Under these circumstances, students and instructors at WHINSEC could reasonably conclude that them identities would not be disclosed without their permission.
Accordingly, we conclude that the affidavits and other evidence submitted by the DOD are sufficient to carry the DOD’s burden to establish that disclosure of the requested information gives rise to a nontrivial risk of harassment and mistreatment.
B
At step two, we balance the privacy interests identified at the first step against the public interest favoring disclosure. In order to conduct this balancing, we begin by identifying the public interest at issue, focusing on the “only relevant public interest under Exemption 6,” which is “the extent to which the information sought would she[d] light on an agency’s performance of its statutory duties or otherwise let citizens know what their government is up to.” Forest Serv. Emps., 524 F.3d at 1027 (internal quotation marks omitted).
The plaintiffs argue that their request for the identities of the WHINSEC students and instructors bears directly on two statutory duties of the DOD. First, the DOD is required to deny assistance, including WHINSEC training, to- any “unit *768 of a foreign security force if the Secretary of Defense has credible information that the unit has committed a gross violation of human rights.” 10 U.S.C. § 2249e(a). Second, plaintiffs argue that the DOD must “ensure that when an individual is designated to receive United States training, equipment, or other types of assistance [including WHINSEC training] the individual’s unit is vetted as well as the individual.” 22 U.S.C. § 2378d(d)(5), But this second statutory obligation is imposed only on the Secretary of State, who was not the recipient of the plaintiffs’ FOIA request, and Congress assigned the DOD only the correlative obligation to consult with the State Department regarding information on units that have committed human rights violations. 10 U.S.C. § 2249e(a). Nevertheless, we will assume for the sake of argument that the DOD’s obligation to consult with the State Department is analogous to the State Department’s obligation to screen potential students at WHINSEC, and that both obligations are meant to ensure that members of a foreign security unit that has engaged in human rights abuses (and by extension, individuals who have themselves engaged in human rights violations) are not allowed to participate in WHINSEC training.
Plaintiffs contend that obtaining the identities of the WHINSEC students and instructors will allow them to discover deficiencies in the vetting process, and they submit an affidavit identifying two instances where the Secretary of State mistakenly allowed individuals who had allegedly participated in human rights abuses to attend the school.[18] Although we agree there is a public interest in identifying even isolated instances of government error in performing its statutory duties, we deem the interest to be small in this context. Even assuming SOAW has identified two errors among the thousands of students that trained at WHINSEC from 2001 through 2004, this does not amount to a “meaningful evidentiary showing” that “responsible officials acted negligently or otherwise improperly in the performance of their duties.” Favish, 541 U.S. at 174, 124 S.Ct. 1570. Moreover, information regarding the effectiveness of the Department of State’s procedures for vetting prospective trainees is available to the public through the Board of Visitors’ public reports. See 10 U.S.C. § 2166(e)(5). Given the ongoing governmental review of DOD compliance and the absence of a meaningful showing of noncompliance, the disclosure of the names of all students and instructors at WHINSEC would not have significant “marginal additional usefulness,” Forest Sem Emps., 524 F.3d at 1027-28, or contribute “significantly to public understanding of the operations or activities of the government,” Fed. Labor Relations Auth., 510 U.S. at 495, 114 S.Ct. 1006 (emphasis omitted).
Second, plaintiffs contend that they can use the names of WHINSEC students to track their conduct after they have received their training. According to plaintiffs, if WHINSEC attendees violate human rights once they return to their service in foreign governments, it shows that WHINSEC human rights training is not effective. We disagree. While Congress required WHINSEC to provide mandatory instruction on human rights, *769 §-2166(d)(1), the reports from the Board of Visitors and Secretary of Defense make clear that WHINSEC is exceeding congressional requirements in this area. The Board of Visitors regularly monitors, reports on, and makes recommendations for improvements to WHINSEC’s curriculum. 10 U.S.C. § 2166(e)(4)(A); see also Memorandum from Matthew D. Anderson & Robert C. Morlino, WHIN-SEC BoV, on Curriculum Review of WHINSEC (July 18, 2007) (Annex 3 in Sec’y of Def., Annual Report to Cong, on the Activities of the Western Hemisphere Institute for Security Cooperation 19 (2007)). The relationship between WHIN-SEC’s obligation to provide human rights training to WHINSEC" students and the subsequent conduct of foreign law enforcement or military personnel, perhaps years after their training at WHINSEC, is tenuous at best. Even if individual attendees are later alleged to engage in human rights abuses, such subsequent incidents are unlikely to shed light on what the government is currently “up to” at WHINSEC. Yonemoto, 686 F.3d at 694. Given the Board of Visitors’s responsibility for monitoring and reporting on WHINSEC’s curriculum, the disclosure of the names of all foreign students and instructors at WHINSEC would not “add significantly to the already available information concerning the manner in which [the agency] has performed its statutory duties,” Prudential Locations, 739 F.3d at 433, or “appreciably further the public’s right to monitor the agency’s action,” Forest Serv. Emps., 524 F.3d at 1027. The Supreme Court has ruled that the purposes of FOIA are not fostered by disclosure of information about private individuals that “reveals little or nothing about an agency’s own conduct,” Reporters Comm. for Freedom of Press, 489 U.S. at 773, 109 S.Ct. 1468.
Having defined the public interest at stake, we now weigh it against the privacy interest of the WHINSEC students. and instructors. DOD has. presented evidence that disclosing the names of WHINSEC students and instructors would put them at risk of harassment, retaliation, or even death. Where serious privacy risks are present on one side of the balance, strong public interests are required in order to tip the scales toward disclosure. Forest Serv. Emps., 524 F.3d at 1027. Because any incremental value stemming from the disclosure of the identities of WHINSEC students and instructors is small, the public interest in this case is not significant compared to the risk of disclosure. We therefore conclude that disclosure would give rise to a “clearly unwarranted” invasion of privacy and that the information requested by plaintiffs is exempt from disclosure under Exemption 6 of FOIA.
The dissent disagrees with our application of the FOIA balancing test because it is not persuaded by the government’s reasons for instituting a new policy to withhold the names of students and instructors in 2005. The dissent argues that because the DOD disclosed the names of SOA and WHINSEC students and instructors until 2004, it must “provide a satisfactory explanation” for its change in policy in order to invoke Exemption 6. Dissent at 776.
The dissent’s analysis is wrong for several reasons. Most important, FOIA does not impose' a duty on the government to provide a satisfactory explanation of a change in its policy; rather, it merely requires us to decide on the record before us whether disclosure of the requested information would give rise to a “clearly unwarranted” invasion of privacy. 5 U.S.C. § 552(b)(6). Here, the government’s assertion that disclosure would do so is both logical and plausible. Applying simple common sense, there is no question that there *770 are many groups in foreign countries that would seek to harm those who are publicly associated with the United States military. And it is equally plausible that the risks facing WHINSEC students and instructors are sufficient to justify withholding under Exemption 6. Even the dissent concedes that these risks are real. Dissent at 770, 776.
But even if we were to evaluate the government’s explanation of its policy decision, we disagree with the dissent’s view that the government did “not provide a satisfactory explanation.” Dissent at 776. The government explained that the DOD circulated an internal memorandum changing its policies regarding disclosure of the names of defense personnel two months after the terrorist attacks of September 11, 2001, and realized that international personnel should be accorded the same protection some years later. In our view, a government bureaucracy’s failure to demonstrate speed and efficiency in applying a policy issued in one context to a related but different context does not raise the inference that the government is hiding the true reasons for that policy. Indeed, it took the DOD five years to formalize its policy regarding American military personnel after it circulated its informal memo. See 32 C.F.R. § 618.13(f)(2); see also The Freedom of Information Act Program, 71 Fed. Reg. 9222, 9232 (Feb. 22, 2006).[19]
Because disclosing the names of WHIN-SEC students and instructors would give rise to a “clearly unwarranted” invasion of privacy, those names are therefore exempt from disclosure under Exemption 6 of FOIA.
REVERSED.

. The dissent provides a much lengthier and more detailed discussion of SOA’s history, relying primarily on newspaper articles and other extra-record material. Dissent at 770-72. While this further illuminates the reasons for Congress’s decision to address these issues through legislative enactments, the dissent's historical research is otherwise not relevant to the legal question before us: whether the public’s interest in monitoring the DOD’s performance of its current statutory duties with respect to WHINSEC outweighs the privacy interest of WHINSEC students and instructors.

. Specifically, the Leahy Amendments stated:
None of the funds made available by this Act may be provided to any unit of the security forces of a foreign country if the Secretary of State has credible evidence that such unit has committed gross violations of human rights, unless the Secretary determines and reports to the Committees on Appropriations that the government of such country is taking effective measures to bring the responsible members of the security forces unit to justice: Provided, That nothing in this section shall be construed to withhold funds made available by this Act from any unit of the security forces of a foreign country not credibly alleged to be involved in gross violations of human rights: Provided further, That in the event ’ that funds are withheld from any unit pursuant to this section, the Secretary of State shall promptly inform the foreign government of the basis for such action and shall, to the maximum extent practicable, assist the foreign government in taking effective measures to bring the responsible members of the security forces to justice.
§ 570, 111 Stat. at 2429.

. See Appropriations 2000—Department of Defense, Pub. L. 106-79, § 8098, 113 Stat. 1212, 1259 (1999); Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2002, Pub. L. No. 107-115, § 556, 115 Stat. 2118, 2160 (2002); Department of Defense Appropriations Act, 2004, Pub. L. 108-87, § 8077, 117 Stat. 1054, 1090 (2003); Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act, 2006, Pub. L. 109-148, § 8069, 119 Stat. 2680, 2714 (2005); Department of Defense Appropriations, Pub. L. No. 110-116, § 8062, 121 Stat. 1295, 1328 (2007).

. 22 U.S.C.. § 2378d(a) states: “No assistance shall be furnished under this chapter or the Arms Export Control Act to any unit of the security forces of a foreign country if the Secretary.of State has credible information that such unit has committed a gross violation of human rights.”

. The requirement that the Secretary of State "establish, and periodically update, procedures to ... ensure that ... the individual’s unit is vetted as well as the individual” was added to the statute on December 23, 2011, see Consolidated Appropriations Act, 2012, Pub. L. 112-74, § 2378d, 125 Stat. 786, 1216 (2011), after the March 1, 2011 FOIA request in this case. The parties do not argue that this affects our analysis of the plaintiffs’ FOIA request for information about individual students and instructors at WHINSEC, and therefore we do not address this issue.

. The minutes for each Board of Visitors meeting may be found online under the link for the relevant year. See Committee History 2002-2015, Board of Visitors WHINSEC, online at <https://database.faca.gov/committee/ histories.aspxPcid=1860 & fy=2002>.

. Online at <https://database.faca.gov/ committee/historymeetingdocuments.aspx? flr=96919 & cid=1860 & fy=2002>.

. Online at- <https://database.faca.gov/ committee/historymeetingdocuments.aspx? flr=96910 &cid=1860 &fy=2005>.

. See, e.g., Board of Visitors WHINSEC, Annual Organizational Meeting 2015 (Nov. 21, 2014), online at <https://database.faca.gov/ committee/historymeetingdocuments. aspx? flr= 132290 & cid=1860 & fy=2015>.

.According to the Annual Report to Congress, WHINSEC's human rights curriculum "consisted of nine integrated parts: Democracy and Human Rights Class, Democracy and Human Rights Week, the Intermediate Level Education (ILE) Electives, Human Rights Instructor Course, Engagement Skills Training Facility, Human Rights Subject Matter Expert Exchanges, Human Rights NGO Roundtables, and the Field Studies Program.'' Sec’y of Def., Annual Report to Cong, on the Activities of the Western Hemisphere Institute for Security Cooperation 3 (2007). The report included a detailed description of this curriculum. Id. at 4-6.

. The Board also noted that according to the State Department, there was “no evidence to verify the very serious charges” that were ma'de against these individuals. Id.

. See National Defense Authorization Act for Fiscal Year 2012, Pub. L, 112-81, 125 Stat. 1298 (2011); National Defense Authorization Act for Fiscal Year 2013, Pub. L, 112-239, 126 Stat. 1632 (2013); National Defensfe Authorization Act for Fiscal Year 2014, Pub. L. 113-66, 127 Stat. 672 (2013); Carl Levin and Howard P. “Buck” McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. 113-291, 128 Stat. 3292 (2014).

. The district court separately addressed the plaintiffs' request for WHINSEC unit information in an order issued July 29, 2013. This issue is not before us.

. FOIA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency.” 5 U.S.C. § 551(1). There is no dispute that the DOD is an agency subject to FOIA.

. Exemption 7(C) allows withholding "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records ... could reasonably be expected to constitute an unwarranted invasion of personal privacy.” 5 U.S.C. § 552(b)(7)(C). As we explained in Yonemoto, because both Exemption 7(C) and Exemption 6 "require balancing the public interest with personal privacy, cases interpreting the interest in personal privacy with regard to one of the two exemptions are useful in the context of the other.” 686 F.3d at 693 n.7 (internal quotation marks omitted). "If a nontrivial privacy interest is at stake, however, Exemption 7(C) requires a somewhat higher showing of public interest to overcome it than does Exemption 6." Id.

. Although both Reporters Committee and Favish concern Exemption 7(C), we have previously relied on them to define what makes a privacy interest "nontrivial.” See Yonemoto, 686 F.3d at 693.

. Contrary to the dissent's implication, Favish's holding is nqt limited to cases where the FOIA request seeks "materials related to the alleged mishandling of an investigation into one isolated incident.” Dissent at 774. In Associated Press v. U.S. Dep’t of Def., for instance, the Second Circuit considered a FOIA request for detainee-identifying information in the records of DOD's investigation of allegations of detainee abuse at Guantanamo Naval Bay. 554 F.3d 274 (2nd Cir. 2009). In response to the requester's public interest argument that the information was needed to determine whether DOD "responded differently to. allegations of abuse depending on the nationalities or religions of the abused detainees,” the court held that the argument was “squarely foreclosed by Favish,” because “there is no evidence of government impropriety in that regard.” Id. at 289; see also Union Leader Corp. v. U.S. Dep’t of Homeland Sec., 749 F.3d 45, 56 (1st Cir. 2014) (holding that-'there was a public interest in disclosing the identities of arrested aliens to determine whether the government had been negligent in handling its removal duties, because evidence that the "aliens ... had been convicted of crimes and/or ordered removed from the United States as long as 23 years before their 2011 arrests” was "at least enough to warrant a reasonable belief ‘that the alleged Government impropriety might have occurred’ ”) . (quoting Favish, 541 U.S. at 174, 124 S.Ct. *766 1570). Indeed, Favish stated that it intended to give courts general direction for balancing categories of privacy interests against categories of public interest, so that courts would not be "left to balance in an ad hoc manner with little or no real guidance.” 541 U.S. at 173, 124 S.Ct. 1570. Here, the public interest asserted falls within the same category as the public interest at issue in Favish: in both cases, there is a public interest in the question whether "responsible officials acted negligently or otherwise improperly in the performance of their duties.” Id. at 174, 124 S.Ct. 1570.

. One individual allegedly commanded a unit that beat and shot 16 members of an indigenous organization in 1983 and then was allowed to attend WHINSEC in 2003. A second individual was allegedly responsible for the kidnapping and torture of a human rights organizer in 1997 and then attended WHIN-SEC in 2002. SOAW also points to three students who attended WHINSEC while under official investigation for corruption, which is not alleged to be a human rights abuse.

. The dissent also speculates that the threats facing WHINSEC students and instructors were "undoubtedly” present during the decade from 1994 to 2004, and so infers that it would be unreasonable for the government to change its nondisclosure policy starting in 2005. Dissent at 776. There is no support in the record for this speculation, and it is equally likely that escalating violence influenced the government's decision to change its nondisclosure policy in 2005. See, e.g., Mary Jordan & Kevin Sullivan, Border Police Chief Only Latest Casualty in Mexico Drug War, Wash. Post, June 16, 2005 (reporting on Mexico’s “worst barrage of drug-related violence in years” and noting that an "increasing number” of victims of drug violence are "public servants” who "stood up to organized crime”); Ginger Thompson & James C. McKinley, Jr., Mexico’s Drug Cartels Wage Fierce Battle for Their Turf, N.Y. Times, Jan. 14. 2005 (noting that while in "the last four years” Mexico had made advances in its fight against drug cartels, a new wave of drug related killings showed that cartel leaders had begun to regroup, and noting that at least 34 people, including three federal agents and two journalists, had been assassinated in the last six months of 2004).